IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 18-cv-02644-RBJ-KMT

KYLE GRAY,

  Plaintiff,

v.

EVA LITTLE, and
JAMES FALK,

  Defendants.

---

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

  Plaintiff Kyle Gray brings § 1983 failure-to-protect claims against defendants Eva Little and James Falk. Before the Court is defendants' motion for summary judgment. ECF No. 80. For the reasons discussed below, the motion is GRANTED in part and DENIED in part.

## I. FACTUAL BACKGROUND

  In 2010 plaintiff received a plea bargain in exchange for testifying against a member of a white supremacy organization in a high-profile murder trial. ECF Nos. 7 at 7; 80 at 3. In the mittimus relating to his conviction, the state court "recommend[ed] the inmate swap program through DOC," and that the Colorado Department of Corrections ("CDOC") "make it's [sic] best efforts to segregate the Defendant from any white supremacy gangs. This is for the safety of the Defendant." ECF No. 7 at 20. Plaintiff was initially sent to Buena Vista Correctional Facility ("BVCF") on July 27, 2020. ECF No. 92 at 48–49. BVCF placed him in general population

despite plaintiff's voicing concerns about custody issues and security threat groups ("STGs") (gangs), specifically white supremacy groups. Shortly after arriving there, other white supremacists in the facility assaulted plaintiff. Mr. Gray was subsequently removed from general population for his safety. *Id.* at 21–22.

Plaintiff wanted to be transferred outside of Colorado because he believed he could not be safely housed anywhere in the state. At the time, according to plaintiff, Colorado did not have a protective custody system in place—it was only created after he left. *Id.* at 44 [Gray Deposition 127:12-25]. Plaintiff hoped that being in a new state where no one knew him would enable him to live safely in general population. ECF Nos. 80-1 at 99:3-21; 92 at 35 [Gray Depo. 59:13-24]. In December 2010 plaintiff was transferred to the Iowa Department of Corrections. ECF No. 92 at 21, 48. While he was initially safe there, after a few years other inmates discovered that he had testified against his former co-defendant and was a "snitch." ECF No. 92 at 39 [Gray Depo. 97:7-20]. Following this discovery members of white supremacist gangs in his Iowa facility began to threaten his safety. *Id.* at 42 [Gray Depo. 110:1-4].

In April 2014 plaintiff wrote a letter to Larry Turner, Interstate Compact Advisor for Colorado, requesting to be transferred back to Colorado. Plaintiff hoped that he would be sent from Colorado to yet a new state, this time with an alias, where he was unknown and could serve the remainder of his sentence in general population. *Id.* at 39, 43 [Gray Depo. 97:21–100:22, 122:15–123:7]. Though his request was ultimately approved, it took several years. In July 2016 plaintiff was transferred to the Iowa State Penitentiary, a different Iowa facility, due to his safety concerns. There he was placed in protective custody pending his return to Colorado. *Id.* at 22.

The "chronological record," part of plaintiff's offender file, provides notes for some of

the events CDOC recorded about plaintiff.  On September 7, 2016 the record says, "[r]ec'd email

from ICC Coordinator regarding the need to return offender Gray to Colorado due to housing

issues.  They have made attempts at different facilities, but he has sabotaged himself.  There is

also a prior Colorado offender there that remembers him and his case." *Id.* at 47.  In October

2016 plaintiff was finally returned to Colorado via the Denver Reception and Diagnostic Center

("DRDC").  During his transport he asked transport officers about his STG and custody issues,

and they said that he could address them upon arriving at DRDC.  Upon arrival staff took him

straight to the segregation unit and told him that they would keep him out of general population

pending protective custody review. *Id.* at 22.

In October 2016 defendant Eva Little was a CDOC Lieutenant and a member of CDOC's

United Intelligence Team ("UNIT"), which "monitors all security group activities within

correctional facilities."  ECF No. 80-2 at ¶ 1.  On October 27, 2016 defendant Little interviewed

plaintiff.  According to plaintiff she asked him about being in segregation, and he explained that

he had been removed from general population pending protective custody review.  He says he

mentioned his desire to be transferred out-of-state again, that he would not be safe in general

population at any CDOC facility due to his custody and STG issues, and that those custody and

STG issues were and continued to be verified and validated.  ECF No. 92 at 23.  Plaintiff did not

explicitly ask to be placed in protective custody in Colorado because, according to him, he did

not know CDOC had developed a protective custody program while he was in Iowa. *Id.*

There is no record of this October 27, 2016 interview in the sections of the chronological

record provided to the Court. *See* ECF Nos. 80-6; 92 at 46–52.  Nor have defendants produced

notes from the meeting.  While Lt. Little confirmed the interview occurred, she reported only

that "Mr. Gray said that he wanted to be placed in general population."  ECF No. 80-2 at ¶¶ 8,

10.  After the interview plaintiff was returned to DRDC general population.  He spoke to housing

unit staff about his custody and STG issues again, and also spoke to his mother about his

concerns.  ECF No. 92 at 23.

On November 7, 2016 plaintiff was transferred to the Limon Correctional Facility

("LCF").  Defendant James Falk was the warden there at the time.  ECF No. 80-4 at ¶ 1.

Plaintiff states that a Lieutenant Heuerman interviewed him first during the intake process.

Plaintiff described his STG and custody issues and said he would not be safe at LCF.  He claims

that Lt. Heuerman never informed him of the new protective custody process or that he had to

complete a form, nor did Lt. Heuerman give plaintiff the form.  Instead, plaintiff claims that Lt.

Heuerman merely said that his former co-defendant had just been transferred from LCF, and that

plaintiff should cover up his tattoos.  ECF No. 92 at 24.

Case Manager ("CM") Michael McCallum also conducted a new arrival interview with

Mr. Gray once he arrived at his LCF housing unit.  The record says, "[c]lassification notes

indicate that this is an interstate offender returned to CDOC from the Iowa Dept. of corrections."

*Id.* at 46.  Further down it says, "Custody issues.  Fourteen noted, none at LCF."  In response to

the question "[d]ou you have any gang issues?" it says "[y]es.  Concerned about any [redacted]

offenders."  *Id.* at 51.  In response to the question "[i]s there anyone at LCF who has threatened

you or would jeopardize your safety?" it says, "[n]o.  Gray indicated he wished to go to general

population."  *Id.* at 47.  The final note for that entry reads, "Gray was recommended for release

to general population."  *Id.*

Plaintiff himself states that he shared with CM McCallum all the same custody and STG

issues and security concerns.  He disputes that he indicated he wanted to go to general population, saying that he responded he did not know anyone at LCF when asked if he had any enemies there, but that he also said he would not be safe at LCF.  *Id.* at 25.  According to plaintiff CM McCallum did not tell him about the protective custody process or provide him a form to fill out, instead instructing plaintiff to write a letter detailing his custody and STG issues—which plaintiff did.  *Id.*  An entry in the chronological record from the next day, November 8, 2016, reads 'CUSTODY ISSUE letter received and forwarded to CM MCCALLUM and CM II EVANS at LCF."  *Id.* at 46.  Plaintiff says he never received a response to his letter.  *Id.* at 26.

On November 11, 2016 around 9:30am plaintiff was assaulted in the recreation area.  The attack began with another white inmate kicking plaintiff in the face while plaintiff was doing pushups.  During the initial fight other white offenders purportedly shouted things like "snitch" and "kill the snitch!"  *Id.* at 26.  Shortly after, about seven other white offenders surrounded plaintiff and began to punch and kick him.  They knocked him to the ground, and he lost consciousness.  After hours of sitting alone in a segregation cell, plaintiff was taken to LCF Medical and then to Lincoln Community Hospital, where medical staff treated him.  *Id.*

A chronological record entry from November 11, 2016 indicates that a Lieutenant Matthew Wargo received a call from plaintiff's mother "stating that her son had been beaten and had laid in a pool of his blood for 5 hours before he was given medical attention."  *Id.* at 46.  It also states that Lt. Wargo told her plaintiff "was being cared for and was not in any danger."  *Id.*

When he returned to LCF from the hospital plaintiff was placed in segregation.  He states that around November 12, 2016 Lt. Heuerman interviewed him regarding the assault and gave

him protective custody paperwork to fill out.  The form itself is dated November 14, 2016,

signed by plaintiff, and states that because of his testimony against his co-defendant "every white

person is considered my enemy here."  ECF No. 80-7.

On November 15, 2016 CM McCallum spoke with plaintiff because "he was removed

from general population pending investigation for an offender assault that occurred in recreation"

in which Gray appeared to have been the victim.  The chronological record indicates that

McCallum explained the classification process to Gray, and that Gray said he understood.  ECF

No. 92 at 46.  Another entry from that day states that Gray's mother called CM McCallum about

plaintiff's safety.  McCallum "assured her that LCF is investigating a recent incident involving

her son and that the facility has a vested interest in ensure [sic] that he is safe."  *Id.*

Plaintiff states that he attended a Protective Custody Review Board Hearing on

November 16, 2016, during which he was questioned about why he felt he needed to be placed in

protective custody.  He states that on the next day, November 17, 2016, he was approved for

protective custody.  *Id.* at 27.  According to the chronological record, CM McCallum completed

a reclassification form on November 18, 2016 recommending that plaintiff be transferred to a

different facility.  *Id.* at 46.  As of the time plaintiff filed this lawsuit, he was in protective

custody.  ECF Nos. 7 at 12; 80 at 8.

Relevant to this case is the CDOC Administrative Regulation ("AR") on Protective

Custody.  Its policy statement reads, "[i]t is the policy of the [CDOC] to provide adequate

alternative housing placement for offenders who are at substantial risk of serious harm if placed

in a general population setting."  ECF No. 92 at 86.  The regulation's procedures section states,

"[p]rotective custody is intended for those offenders requiring protection based on the criteria in

one or more of the following categories. . . 1. Witness Protection: Offenders who have

documented cooperation and/or testimony to assist criminal justice agencies. . . . 4. Security

threat group considerations." *Id.* at 87.

Section C, "Protective Custody Status Placement," says in relevant part:

2. The need for protective custody status will be determined by the Protective Custody
Review Committee.
3. Offender Requests for Protective Custody:
  a. Offenders requesting voluntary placement in protective custody will be
  required to provide a written statement justifying the need for placement in
  protective custody, to include a list of all those individuals who are considered to
  be a threat and the reason the threat is serious enough in nature to require
  protective custody utilizing AR Form 650-02A, Offender Protective Custody
  Request.
  b. The offender's request for protective custody will be investigated by the facility
  intelligence officer/or designee who will provide an intelligence assessment to the
  internal classification committee.
  c. Upon receiving notification that an offender is requesting protective custody,
  the current facility will complete AR Form 650-02B, Protective Custody Review
  Form, and forward it to the internal classification committee.  The internal
  classification committee will review the offenders [sic] request, the intelligence
  assessment and any additional pertinent information and develop a
  recommendation for appropriate placement based on behavior, risk factors and
  individual case planning objectives. . . .
4. Involuntary Review for Protective Custody:
  a. Facilities may initiate and request a review for protective custody status placement
  if they have information of a legitimate verifiable threat to an offender, by following
  the same steps as identified for offender requests for protective custody.

*Id.* at 87–88.

## II. PROCEDURAL BACKGROUND

Plaintiff filed this case on October 16, 2018.  ECF No. 1.  Defendants moved to dismiss

his amended complaint, which alleged claims against twelve individual defendants, in March

2019.  ECF No. 26.  In November 2019 Magistrate Judge Tafoya recommended granting in part

and dismissing in part defendants' motion, and this Court adopted her recommendation in

February 2020.  ECF Nos. 45, 59.  In doing so,  the Court dismissed plaintiff's claims against all but two defendants.  Eva Little and James Falk, the remaining defendants, moved for summary judgment in September 2020.  ECF No. 80.

### III. STANDARDS OF REVIEW

**A.  <u>Summary judgment</u>**

A court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324.  A fact is material "if under the substantive law it is essential to the proper disposition of the claim."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  The court will examine the factual record and make reasonable inferences in the light most favorable to the party opposing summary judgment.  *See Concrete Works of Colo., Inc. v. City and Cty. of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).

**B. <u>Pro se litigants</u>**

Mr. Gray is proceeding pro se.  When hearing claims brought by pro se litigants, courts should liberally construe allegations in their pleadings and consider their claims broadly rather than as isolated paragraphs.  *Trackwell v. U.S. Gov't*, 472 F.3d 1242, 1243 (10th Cir. 2007). Although pro se pleadings should be liberally construed, a pro se plaintiff is not "relieve[d]… of

the burden of alleging sufficient facts on which a recognized legal claim could be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). Pro se parties must "follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (internal quotation marks and citations omitted). Furthermore, while pro se litigants will not be held to the same standards as licensed attorneys, it is improper for the judge to serve as the unrepresented litigant's advocate. *Hall,* 935 F.2d at 1110.

## IV. ANALYSIS

In their motion for summary judgment defendants Little and Falk argue that plaintiff has failed to demonstrate genuine factual disputes regarding his alleged constitutional violations, and that they are entitled to qualified immunity. I address each argument separately.

### A.  Constitutional violation

Mr. Gray alleges that defendant Little and defendant Falk are liable under § 1983 for failing to protect him from violence by white supremacist gang members. A plaintiff must demonstrate a defendant personally participated in the alleged constitutional violation in order to proceed on any § 1983 claim. *Henry v. Storey*, 658 F.3d 1235, 1241 (10th Cir. 2011). To establish personal participation, a plaintiff must show how the defendant caused the deprivation of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Regarding failure-to-protect claims specifically, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (citation omitted). Failure-to-protect claims such as these arise under the Eighth Amendment and have both an objective and subjective component. *Smith v. Cummings*, 445 F.3d 1254, 1258 (10th Cir. 2006). "[I]n order to establish a cognizable Eighth Amendment claim

for failure to protect, a plaintiff 'must show that he is incarcerated under conditions posing a substantial risk of serious harm,' the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component." *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001) (quoting *Farmer*, 511 U.S. at 834). In *Farmer* the Supreme Court gave an example of an official's subjective knowledge of the risk of harm:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43 (internal quotation marks omitted).

Negligence does not support the subjective component of deliberate indifference. *Estelle v. Gamble*, 429 U.S. 97, 104–06 (1976). Nor is it sufficient under deliberate indifference to show that the official "fail[ed] to alleviate a significant risk that he should have perceived but did not." *Farmer*, 511 U.S. at 838. "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly [or] recklessly declined to act." *Howard v. Waide*, 534 F.3d 1227, 1239–40 (10th Cir. 2008) (quoting *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 620 (11th Cir. 2007)). "In determining whether prison officials acted reasonably, we consider what actions they took, if any, as well as available alternatives that might have been known to them." *Id.* at 1240.

1. Defendant Little

Defendant Little's first argument is that plaintiff has failed to show she personally participated in any alleged constitutional violation. She bases this argument on the fact that she "was not involved in the decision to place Plaintiff in the general population at LCF." ECF No.

10

80 at 11.  She writes that she was a member of the Unified Intelligence Team, which plays no role in classification decisions such as those regarding protective custody and that instead the decision to house plaintiff in LCF's general population was made by CDOC's Offender Services Division.  *Id.*; ECF No. 80-2 at ¶¶ 1, 2, 6.

I am unconvinced by defendant Little's argument.  Plaintiff has come forth with sufficient facts to create a genuine dispute as to whether she personally participated in failing to protect him from physical attacks by white gang members at LCF.  Plaintiff asserts in his sworn affidavit that he told Lt. Little in the October 27, 2016 meeting that he had been removed from general population pending protective custody review; that he desired to go out-of-state again but with an alias; that he would not be safe in the general population of any CDOC facility (which would include LCF); that his STG and custody issues related to white gang members and white supremacists were the same as those he had when he was transferred out-of-state in 2010; and that these issues were validated and verified.  ECF No. 92 at 23.  He states that in response she said he had "fucked up" any chance of going of going out-of-state again, and that CDOC had tried to help him, but he had "fucked" that up.  *Id.*  Plaintiff also asserts that Lt. Little said CDOC would do nothing further to ensure his safety, that there was no guarantee regarding where he would be placed, and that the sentencing mittimus requesting he be segregated from white supremacists was "merely a recommendation that the CDOC did not have to follow."  ECF No. 7 at 11.[1]  Defendant Little denies all of these statements, ECF No. 80 at 12, but this simply shows

---

[1] These statements are from plaintiff's sworn complaint.  "A district court may treat a verified complaint as an affidavit for purposes of summary judgment if it satisfies the standards for affidavits set out in Rule 56(e)," i.e., if it is based on personal knowledge, sets forts facts that would be admissible evidence, and shows the affiant is competent to testify to the statements made therein.  *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1019 (10th Cir. 2002) (internal quotation marks and citation omitted).  The statements I relay here are ones about which he has personal knowledge and is competent to testify, and that are admissible under F.R.E. 801(d)(2).

that there is a genuine dispute regarding what she said—a credibility issue that must go to a jury.

The Court rejects Lt. Little's continued insistence that she had nothing to do with plaintiff's placement in general population or in protective custody for two reasons. First, the Court finds there is a genuine dispute as to whether she provided input to plaintiff's custody status. AR 650-02 on protective custody states that "[t]he offender's request for protective custody will be investigated *by the facility intelligence officer/or designee who will provide an intelligence assessment to the internal classification committee*." ECF No. 92 at 87–88 (emphasis added). It is undisputed that Lt. Little was an intelligence officer at the time she interviewed plaintiff, and that her role involved investigating and providing intelligence about STGs to others within CDOC. This suggests that even if she was not a final decisionmaker regarding plaintiff's classification and placement, she provided input into the process. Thus, she could have raised plaintiff's known, documented STG and custody issues with the Interstate Corrections Compact ("ICC") and potentially prevented plaintiff's being placed in general population. Viewing the evidence in the light most favorable to Mr. Gray, as I must, I conclude that his assertions about what she said during the October 27 interview further suggest she was involved in the process. Had she no involvement or input as to plaintiff's placement, it would be strange for her to comment that plaintiff "fucked up" his placement and that CDOC would not ensure his placement going forward.

The second reason I reject defendant Little's personal participation argument is that, even if she were not directly involved in plaintiff's placement decision, this does not absolve her from the constitutional duties she owes him. The duty of prison officials to protect inmates from harm is an affirmative one. *Farmer*, 511 U.S. at 852 (Blackmun, J., concurring) (referring to the

"affirmative duty under the Constitution to provide for the safety of inmates . . . ."). Plaintiff has come forth with admissible evidence that he told defendant repeatedly he was in danger of being harmed. Once she was on notice of this known threat, she had a duty to respond reasonably. That plaintiff was assaulted by white gang members almost immediately after being placed in general population—just days after telling Lt. Little he feared that very eventuality— demonstrates that she did not act on this affirmative duty. I thus find that there is a genuine dispute as to whether Lt. Little personally participated in plaintiff's constitutional violation.

I also find that plaintiff has pointed to a genuine dispute regarding a substantial risk of serious harm, and deliberate indifference by defendant Little. Plaintiff was assaulted by white gang members in retaliation for his "snitching" in 2010 and was transferred back to Colorado due to safety concerns arising from white supremacists' learning his identity in Iowa. The mittimus suggested separating plaintiff from "any white supremacy gangs," a very broad statement that would implicate plaintiff's safety in virtually any correctional facility, including LCF. All of this was documented in plaintiff's offender file. Plaintiff was known throughout Colorado and raised the alarm about his STG and custody issues as soon as he was being transported within the state, and indeed he was assaulted by a large group of white gang members within a week of his arriving at LCF general population.

Taken together these facts establish the objective component of his failure-to-protect claim, that he faced a substantial risk of serious harm. His situation is similar to that in *Howard*, where the Tenth Circuit permitted a failure-to-protect claim to proceed where a gang had targeted and sexually assaulted the plaintiff in the past, the plaintiff informed the defendants of his fears of attack through both meetings and grievances, the plaintiff was housed in a less

13

restrictive unit, and the defendants were subjectively aware of the threat the gang posed.

*Howard*, 534 F.3d at 1237. *See also Miller v. Kastelic*, 601 F. App'x 660, 663 (10th Cir. 2015)

(unpublished) (reversing summary judgment for defendants where they had notice of substantial

risk of serious harm because gang members discovered plaintiff was a sex offender and were

extorting him, he informed prison official that his gang member cellmate had threatened him,

and gang members were widely known for their actions against certain types of offenders).

 With respect to deliberate indifference, plaintiff informed defendant Little of his STG and

custody issues, and she would also have known about his safety risks from his offender file.

This satisfies the subjective knowledge component under *Farmer*. Defendant Little then

purportedly stated that the CDOC would do nothing else to ensure his placement because he had

"fucked up" when the CDOC tried to help him, and that the mittimus was merely a

recommendation the CDOC did not have to follow. These statements suggest that she had the

power to influence his placement, and that she affirmatively chose not to help protect him

because he did not deserve it. There is no evidence that she reported his concerns to the ICC, as

AR 650-02 suggests she should have, or even mentioned it in plaintiff's offender file. Lt. Little's

doing nothing in the face of such safety risks to plaintiff, and her in fact alleged taunting him

about these risks, constitutes "knowingly or recklessly declin[ing] to act." *Howard*, 534 F.3d at

1239. *Compare id.* at 1241 (prison officials' "doing absolutely nothing to protect Howard" was

objectively unreasonable given their constitutional duty to consider all reasonable measures for

protection in the face of serious risk of harm from gang) *with Smith*, 445 F.3d at 1258–59

(affirming summary judgment for defendant prison guards where they took measures to secure

protective custody inmates' safety by clearing walkways of other inmates or escorting them

individually, and by moving plaintiff to segregation when he reported feeling unsafe).

In addition to her personal participation argument, defendant Little contends that plaintiff fails to demonstrate a constitutional violation because he did not fill out a form requesting protective custody. ECF No. 80 at 11. She writes that "if Plaintiff was afraid for his safety as he alleges, he would have completed the requisite form at Denver Reception and Diagnostic Center or requested protective custody when he arrived at Limon Correctional Facility." *Id.* This improperly attempts to shift the burden for protection to plaintiff. The duty to protect lies with her. "Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984)); *see also Howard*, 534 F.3d at 1241 ("[T]he limitations of prison grievance procedures cannot override constitutional duties."). It is undisputed that at the time he met with Lt. Little plaintiff was unaware he had to fill out a form to request protective custody, and she does not claim that she told him to. He instead notified her explicitly and repeatedly that he was in danger from white gang members and could not live in general population. Defendant may not refuse to respond to this safety risk and then turn around and blame her inaction on plaintiff.

Finally, defendant Little attempts to argue that plaintiff has not alleged failure to protect by narrowing his claim to mere taunts by her. ECF No. 80 at 12. While she may be correct that such taunts on their own do not rise to the level of a constitutional violation, plaintiff has provided evidence of more than her statements. It is her statements coupled with her inaction in the face of a clear threat to plaintiff's safety that are at issue. Thus, viewing all the evidence in

the light most favorable to Mr. Gray, I conclude plaintiff has demonstrated a genuine, material dispute as to whether defendant Little violated his Eighth Amendment rights.

    2.  <u>Defendant Falk</u>

Like defendant Little, defendant Falk argues that he did not personally participate in any alleged violation of plaintiff's constitutional rights.  He claims he was not involved in the decision to place plaintiff at LCF or in general population, and that he was not even aware plaintiff was an LCF inmate until after the November 11 assault.  ECF No. 80 at 13.  In contrast to my analysis above, here I agree that plaintiff has failed to show personal participation.  On defendants' motion to dismiss, I permitted Mr. Gray's claim against defendant Falk to go forward because plaintiff alleged that his family members called Falk and urged him to place plaintiff in protective custody..  ECF No. 59 at 6.  That ruling was based on my accepting plaintiff's allegations as true.  At this stage, however, plaintiff must come forward with evidence for his claim to survive.

Plaintiff has produced no such evidence.  The chronological record in his offender file shows that the only phone calls his mother made were *after* his November 11 assault, and in neither case did his mother speak to defendant Falk.  ECF No. 92 at 46 (showing phone calls to Lt. Wargo and CM McCallum).  Nor does plaintiff provide an affidavit or deposition testimony from his mother to support these allegations.  *Cf. Aranda v. McCormac*, No. CIV.A. 08-CV-00487, 2010 WL 3893976, at *6, 8–9 (D. Colo. Aug. 18, 2010), *report and recommendation adopted*, No. CIV.A.08-CV-00487, 2010 WL 3893969 (D. Colo. Sept. 30, 2010) (finding genuine dispute regarding two defendants' personal participation because plaintiff produced affidavits from mother and grandmother stating that mother had called to warn about safety risk).

Plaintiff also writes in his brief that he sent kites to Warden Falk about his safety issues.  ECF No. 92 at 12.  But there is no evidence of those kites in the record, and "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings."  *Phillips v. Calhoun*, 956 F.2d 949, 950 n.3 (10th Cir. 1992).

Mr. Gray also cannot hold defendant Falk liable solely because he was warden when plaintiff arrived and was placed in general population at LCF.  "[S]upervisor status by itself is insufficient to support liability" under § 1983.  *Duffield v. Jackson*, 545 F.3d 1234, 1239 (10th Cir. 2008); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996).  There is no respondeat superior liability for § 1983 claims.  Instead, there must be an affirmative link between the constitutional violation and the supervisor's personal actions.  *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009).  To succeed in a § 1983 suit against a defendant-supervisor, a plaintiff must demonstrate: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

Here, plaintiff has produced no evidence suggesting that defendant Falk was linked to or responsible for any policy causing plaintiff's constitutional harm, nor that Falk acted with deliberate indifference.  If anything, the most logical inference from the record is that defendant Falk was responsible for enforcing a policy (AR 650-02) that Lt. Little *defied*.  Plaintiff's only proof of supervisory liability is that Falk was the warden while he was at LCF.  *See* ECF Nos. 7 at 11; 92 at 77.  This is insufficient.  *See Mitchell*, 80 F.3d at 1441 (finding that naming the Warden and Director of Correctional facilities, without alleging "any personal involvement of

17

the parties before the Court," was insufficient for supervisory liability).

In sum, plaintiff has failed to demonstrate a genuine dispute that defendant Falk was personally involved in Mr. Gray's constitutional violation. The failure-to-protect claim against defendant Falk is dismissed. I thus grant summary judgment in his favor.

### B. Qualified immunity

Defendants also move for summary judgment by arguing they are entitled to qualified immunity on plaintiff's claims. Because I have already dismissed the claim against Warden Falk, I address qualified immunity only as to Lt. Little. To avoid application of qualified immunity, a plaintiff must (1) allege facts that make out a violation of a constitutional right, and (2) show that the constitutional right was clearly established at the time it was allegedly violated. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A reviewing court has discretion to address either prong first. *Id.* at 236.

Defendant Little argues that she has not violated any clearly established law, and that plaintiff has thus failed to satisfy the second prong of qualified immunity. ECF No. 80 at 14–15. Her entire argument in this section, however, focuses on disputing that plaintiff has established a constitutional violation. It is thus an argument under prong one, not prong two.

I already found above that plaintiff has produced sufficient evidence for a reasonable jury to find defendant Little violated his constitutional rights. I briefly dispense with defendant's two final arguments that no constitutional violation took place. First, she argues that she was not required to follow the mittimus because inmate placement is at the discretion of the CDOC. Thus, she argues, any alleged noncompliance is not a violation of clearly established law. ECF No. 80 at 16. Second, she alleges that CDOC has broad discretion over inmate classification and

placement decisions. *Id.* In both arguments defendant Little narrows and misconstrues plaintiff's claim. Mr. Gray asserts not that defendant's failure to follow the mittimus is a constitutional violation, but that it is evidence his rights were violated. His claim is properly understood as one for failure to protect. As for CDOC's discretion with respect to following the mittimus and classifying or placing inmates, it does not absolve defendants of their constitutional obligation to protect plaintiff while he is in their care. This argument too is a red herring.

I next turn to the "clearly established" prong of the qualified immunity analysis. Although defendant does not properly argue this prong, I address it so there can be no ambiguity in my ruling. A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he or she was doing violates that right. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotations and citation omitted). Clearly established law should not be defined at a high level of generality. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal quotations and citation omitted). "[E]xisting precedent must have placed the statutory or constitutional question beyond debate." *Ali v. Duboise*, 763 F. App'x 645, 650 (10th Cir. 2019) (unpublished) (internal quotations and citation omitted). The Tenth Circuit has repeatedly counseled, however, that "[w]e cannot find qualified immunity whenever we have a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007).

I have no trouble concluding it was clearly established at the time of Lt. Little's conduct that prison officials had a duty to protect inmates from physical harm by other inmates. This is the exact proposition for which *Farmer* stands. *Farmer*, 511 U.S. at 833; *see also Gonzales v. Martinez*, 403 F.3d 1179, 1186 (10th Cir. 2005); *Verdecia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003); *Ramos v. Lamm*, 639 F.2d 559, 572 (10th Cir. 1980). Furthermore, in *Howard*, a

case with strikingly similar facts, the Tenth Circuit determined that prison officials cannot refuse to separate an inmate from gang members when the officials know of the gang's threats towards the inmate, previous physical assaults against the inmate, and gang members' having approached the inmate. *Howard*, 534 F.3d at 1240–41; *see also Parker v. Ritter*, No. 08-CV-00737-MSK-KLM, 2010 WL 1286081, at *8 (D. Colo. Mar. 25, 2010) (holding that *Howard* "put a prison officials [sic] on notice that when an inmate . . . has been assaulted and threatened by gang members, prison officials cannot recklessly ignore future safety concerns.").

In ruling on defendants' motion to dismiss Magistrate Judge Tafoya found, and I agreed, that it was well-settled that a prison official violated an inmate's Eighth Amendment rights if he failed to take reasonable measures to guarantee the inmate's safety. ECF No. 45 at 13–14. Because plaintiff has come forward with sufficient facts to support his claim against defendant Little, the analysis on qualified immunity at this stage looks no different. Any reasonable correctional officer in defendant Little's position would have known that ignoring an inmate's explicit pleas for protection from predictable gang violence against him would constitute a violation of his Eighth Amendment rights. She is not entitled to qualified immunity on plaintiff's failure-to-protect claim. That claim thus survives summary judgment.

## ORDER

Defendants' motion for summary judgment, ECF No. 80, is granted in part and denied in part as follows:

1. The Court GRANTS the motion with respect to the claim against defendant Falk. That claim is dismissed with prejudice.

2.  The Court DENIES the motion with respect to the claim against defendant Little.  That

claim may proceed to trial.

DATED this 23rd day of July, 2021.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge